Appeal from Trial Term, Washington County.

Action by Charles M. Yarter against Merritt D. Walcott. From a judgment for plaintiff, and an order denying a new trial, defendant appeals. Affirmed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Joseph F. Driscoll, of Albany, for appellant.

Rogers & Sawyer, of Hudson Falls (John E. Sawyer, of Hudson Falls, of counsel), for respondent.

WOODWARD, J. The complaint alleges that the defendant, for the purpose of inducing the plaintiff to enter into a contract for the sale of certain merchandise and for the purpose of obtaining said merchandise, represented to the plaintiff that he, the defendant, was then solvent, and had on hand sufficient money to pay for the same; that the plaintiff, relying upon the representations and induced hereby, parted with the merchandise to the defendant; that said statements were false, and were known by the defendant to be false, and that they were made for the purpose of deceiving and defrauding the plaintiff.

Upon the trial the evidence was clearly sufficient to justify the jury in finding in favor of the plaintiff, and we are of the opinion that the fact that the plaintiff had previously secured a judgment against the defendant for the amount of the purchase price did not operate to an election of remedies. The facts in relation to the known insolvency of the defendant did not appear, and they were unknown to the plaintiff until the defendant's examination in a bankruptcy proceeding which followed the entry of the plaintiff's judgment in an action brought upon the original contract. Under such circumstances the plaintiff cannot be said to have elected between remedies. He merely pursued the remedy open to him upon his contract, and when he found that that contract was founded in fraud he turned to his remedy for fraudulent representations, offering to cancel the judgment on contract; and this court is committed to the doctrine that this practice is lawful. Russell v. Wilber, 150 App. Div. 52, 134 N. Y. Supp. 463.

The judgment and order appealed from should be affirmed, with costs.

---

### In re WYLIE'S WILL.

(Supreme Court, Appellate Division, Third Department. January 7, 1914.)

1. WILLS (§ 306*)—EXECUTION—EVIDENCE—SUFFICIENCY.

In a proceeding for the probate of a will, evidence *held* sufficient to show that the testator prepared and executed a subsequent will to that propounded.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 732, 733; Dec. Dig. § 306.*]

2. WILLS (§ 290*)—SUBSEQUENT WILLS—REVOCATION.

While there is no presumption of law that a subsequent will contains a clause revoking earlier ones, yet, in view of ordinary professional custom,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

it is a fair inference that a will drawn by a lawyer usually contains a general revocation clause.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 663; Dec. Dig. § 290.*]

3. WILLS (§ 119*)—EXECUTION AND PUBLICATION—WHAT CONSTITUTES.

Where an attorney prepared a will for decedent containing the usual attestation clause and read it over to him in the presence of the other subscribing witness, the decedent, by signing the will and requesting the attorney and the other witness to sign it, duly executed and published it as his will, even though he did not expressly declare that fact.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 305–313; Dec. Dig. § 119.*]

4. WILLS (§ 306*)—PROBATE—REVOCATION CLAUSE.

In a proceeding for the probate of a will, evidence *held* sufficient to show that a subsequent will contained a revocation clause.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 732, 733; Dec. Dig. § 306.*]

5. WILLS (§ 198*)—ADMISSION TO PROBATE.

Where a subsequent will in terms revoking all previous ones is duly executed and published, an earlier will becomes of no effect, and it is not revived by the destruction or cancellation of the revoking instrument.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 496, 497; Dec. Dig. § 198.*]

Appeal from Surrogate's Court, Chenango County.

Application by Harvey F. Beardsley for the probate of the will of Floyd Wylie, deceased, opposed by Burton Wylie and others. From a judgment for contestants, proponent appeals. Affirmed.

The opinion of Surrogate Stratton is as follows:

On August 14, 1877, Floyd Wylie, who had then been recently bereaved of his wife, made his will, signed it in the presence of Bertha Beardsley, now Bertha Watrous, then a young woman about 18 years of age, and Clara Beardsley, now Clara Fisher, apparently younger than the other witness, who were the subscribing witnesses to the will. These witnesses were the daughters of Dr. Harvey F. Beardsley, who was then a practicing physician and a justice of the peace, and who drew the will and was made executor thereof and a specific legatee of decedent's gold watch and chain, and also the sole residuary legatee.

The subscribing witnesses are very clear in their recollection of the details of the execution of the will, testifying with considerable minuteness of description as to what occurred more than 35 years ago, and the proof shows— and contestants practically concede—that the formalities of the statute of wills were upheld and the will was legal and legally made and executed by a competent testator.

The will made the following disposition of the decedent's property: To Jane Beardsley, wife of Harvey F. Beardsley, his cousin, $500; to Amelia Wylie, wife of Burton Wylie, his brother, $500; to Russell Wylie, a cousin, $500; to George Wylie, brother of Russell Wylie, a cousin, $1,000; to William Babcock, his late wife's brother, $500; to John Wylie, a cousin, $200; and to Helen Farnsworth, "as long as she remains unmarried the sum of $3,000," and at her death the same to go to Clifford Wylie. It was proven that all the above-named legatees, the total of whose legacies amounted to $6,200, died before the death of the decedent, but the record does not show the times of their respective deaths; it is fair to infer, however, that the decedent was cognizant of such deaths, because of his relationship and acquaintance and apparent interest in them.

He also bequeathed his gold watch and chain to Harvey F. Beardsley, who was named as executor and is the present proponent, and bequeathed to Clif-

ton Wylie the sum of $200, to Robert Wylie the sum of $200, to Buel Babcock the sum of $500, and to the "Wylie Burying Ground" the sum of $1,000, making a total of legacies of $1,900 to legatees now living, including therein the Wylie Burying Ground, the status of which does not appear in this record. He also made the said Harvey F. Beardsley his sole residuary legatee.

There is no evidence given by the proponent to show what was done with this paper after its execution or where it remained during the 35 years of its existence, but it was produced and filed by the proponent in this court on or about January 17, 1913, and after letters of administration had been granted upon the estate of the decedent. The record is extremely scanty and meager with reference to the history of the life of the decedent after the making of this will, and there is absolutely nothing to show his relationship with his relatives and with the persons mentioned in the Beardsley will as the beneficiaries of his bounty. So far as it appears, he might never have had any friendly relations with any of them. It does appear, however, that after the making of the Beardsley will the decedent married one Mary Ann Sackett or, if they were not actually married, he lived with her for a period of years not shown by the evidence, called her his wife, and held her out as such, and there is evidence to show that this woman, who died about the year 1905, was the named recipient of his testamentary bounty. The claim is also made by the contestants that the decedent was the named recipient of her bounty under a reciprocal will made by her prior to her death.

The decedent died on December 23, 1912, leaving personal estate amounting to about $30,000, and some real estate, the value of which does not appear, and leaving his brother Burton Wylie and his two nephews Allen C. Wylie and Harry Wylie, sons of his deceased brother James, his only heirs at law and next of kin surviving him. All of these join as contestants in this proceeding.

[1] The contestants claim that the will of August 14, 1877, was revoked by a subsequent will made in the fall of 1900, which was itself subsequently revoked by its cancellation and destruction after the death of his second wife, so called, and that therefore the decedent died intestate.

I think there can be but little doubt and, indeed, the proponent scarcely contends, but that the decedent made a subsequent will or wills. Mr. Juliand, président of the Greene Bank, produced and identified a record in his own handwriting purporting to contain receipts for papers deposited with the Greene Bank for safe-keeping, and identified thereon the signature of L. E. Chase, Esq., an attorney living in that village, who had for years been the confidential attorney for the decedent, and says at the time of such signature Mr. Chase took from the bank "a lot of papers in envelopes purporting to be wills," and Mr. Chase swears that at this time he took away and receipted for a will of decedent and gave it to the decedent, who took it away with him. No attempt was made, however, to show the contents of this paper, but there can be but little question but that it was a will of the decedent previously made, and there is no proof of due execution of this will and no proof when it was taken up and delivered to the decedent.

At or about the time of that transaction, Mr. Chase swears that some 12 or 13 years ago the decedent came to his office, gave him directions to draw a will, that he did draw such will in accordance with the direction of the decedent, that the will was executed and left in his care, that he remembers that the decedent in this will gave him (Chase) his gold watch and chain, that he made provision for his wife Mary Ann and also for a Miss Stebbins, and at that or some other time he made some provision for a burying ground or cemetery, but Mr. Chase is unable to recall any further details about the will and practically nothing in reference to its execution, but he is clear in his testimony that about this time he drew a will for the decedent according to the directions given him, that he remembers some of its provisions, and that such will was executed.

Horatio S. Fitch swears that in the latter part of October or in November, 1900, he was a clerk in Mr. Chase's office, that the decedent came to the office and inquired for Mr. Chase, and was directed to his private office, where he went; that he heard the decedent tell Mr. Chase that he wanted him to draw

up a will; that decedent said he wanted to give $1,000 to the Wylie Cemetery, and $500 to George Wylie, his gold watch and chain to Mr. Chase, and that other names were mentioned which he does not remember; that soon after the decedent and Mr. Chase came into the outer office where the witness was, and Mr. Chase read over the will "from start to finish," and then asked decedent if "it was all right," and decedent said it was, and then Mr. Chase asked him who he wanted for witnesses, and decedent said, "I want you, Elwyn, and why won't the other fellow do" (meaning Fitch); that he saw decedent sign the paper, and immediately thereafter Mr. Chase and he signed it as witnesses in the presence of decedent, and of each other, that Mr. Chase folded it up, put it in a yellow envelope, and handed it to the decedent, and at that point in the transaction Fitch went out to mail some letters; that while Mr. Chase was reading the will he read therefrom in the presence of the decedent and Fitch, "I revoke all former wills by me made;" and that at the close of the reading decedent said, "That fixes it." Witness also says that, when he heard the talk between Mr. Chase and the decedent preliminary to drawing the will, he heard Mr. Chase ask decedent if he revoked all former wills, and decedent said, "I do." He says that at this time decedent was of sound mind, not under any restraint, and a citizen of the United States; that he knew the attestation clause of the will; and that such a clause was attached to this will and was read by Mr. Chase; and that the reading and execution of the will occurred in the outer office, and the preliminary conversation and drawing of the will in the private office, which was separated by a partition, through which was a door which stood partly open.

Mr. Chase also testified that some time after the death of Mary Ann the decedent came to his office, took the will which had been drawn in 1900, and carried it away.

Susie Austin swore: That she worked for decedent in his household both before and after the death of Mary Ann, and that after her death the decedent took from a box of papers a paper about which he said: "Sue, here is my will; will you read it to me?" That she took the paper in her hands and read through some of it, and he said, "Well, I might as well destroy it. Bug" (meaning Mary Ann) "is dead; there is no use keeping it." She also said that decedent's name or signature appeared on the will, and that the names of Mr. Chase and Mr. Fitch appeared signed as witnesses, and that decedent said that Lawyer Chase of Greene and his clerk were the witnesses, and that she remembers the provision in the will for the Wylie Cemetery, and that the will she read said "it revoked all former wills."

Kate Stebbins, another witness called by contestants and at whose house decedent lived after the death of his wife, testified that about six years ago decedent showed her a paper, that he said was his will, that part of it had been taken off, and that she read part of it, that the decedent said he had torn up the rest of it, that she knew Mr. Chase's handwriting and signature, also the decedent's, and that both of their names and signatures appeared on the instrument and the name of another person she did not remember or know, that the paper was written with pen and ink, and that it contained a legacy of $1,000 to the burying ground, and that the residue of the property went to the decedent's brothers and their heirs, and she also says that she read a revocation clause in the will, and that she read the paper several times and had it in her possession until some time in 1912, when she destroyed it before the decedent died. On cross-examination this witness said that decedent's name was written on the right-hand side of the paper and the names of the two witnesses on the left, and that they were written nearly opposite decedent's name.

There are some discrepancies and apparent errors in some of the details in all this testimony, and proponent produces one witness who swears that Kate Stebbins told him that she had never heard of any will of the decedent except the Beardsley will; but none of the witnesses were impeached or directly discredited. None seem to have any interest in the matter, and their appearance and manner of testifying did not raise any suspicion of perjury or corruption, and they maintained the truth of their statements after a thor-

ough and vigorous cross-examination, and I doubt whether the discrepancies were more than might be expected from honest witnesses, whose memories are usually faulty in respect to some matters, while they are entirely clear as to others. No evidence to contradict or directly impeach these witnesses was submitted by the proponents except as to the witness Stebbins above mentioned.

It would be going a long way to hold that this testimony was altogether false and concocted for the occasion, especially in view of the life of the decedent, and that there is nothing in the record to show that his relations with the proponent were such as to justify or warrant the belief that he desired the proponent to be substantially the sole object of his testamentary bounty. The facts that decedent married, or, at least, lived with a woman whom he called his wife, years after the Beardsley will was made; that his relations and friendships were thereby changed after that time; that he undoubtedly formed other intimacies; that he made at least two wills—would all encourage and foster the conclusion that he made the will of 1900 which he kept until the death of Mary Ann, and that at her death he had sufficient reason to then destroy it. These circumstances strongly corroborate the positive testimony of Mr. Chase that he actually drew and had executed a will in or about the fall of 1900, and the conclusion is almost irresistible that such was the fact.

[2] It being established, then, that a will was drawn and executed at such time, it is, in my judgment, a very short step to the further fact that such will contained a proper revocation clause of all former wills. This will was drawn by a careful and experienced lawyer, one who had a great deal of knowledge and experience in the preparation of wills, and an experience and observation in the drawing and execution of wills for 20 years leads me to believe that not more than one per cent. of such instruments, when drawn by lawyers, fail to contain the usual clause revoking former wills, and, indeed, the printed blank form almost invariably has such a clause therein. It would be much more reasonable to believe that a will drawn by a lawyer contained such a clause than to believe the contrary, and the testimony of all the witnesses that there was such a clause in the will agrees with experience, with reason and with the usual course of practice in such matters. I take it there is no presumption of law that a will contains a revocation clause, but observation, experience, and professional knowledge, in my judgment, create an inference that such would ordinarily be the fact.

Counsel for proponent vigorously criticises some of the statements of the witnesses sworn by contestants, claiming that it is very unreasonable that they should have remembered a great many of the details concerning transactions to which they testified, and which occurred from 6 to 13 years ago; but such criticism ought not to have much weight, when proponent himself rests the proof of his will upon the testimony of witnesses who testified in detail to transactions which occurred more than 35 years ago with considerable clearness and accuracy of description, and I am fully convinced that the subscribing witnesses to the Beardsley will, notwithstanding the long lapse of time, truthfully stated all that they claimed transpired at that time, and I have long since ceased to wonder at either the accuracies or defects of human recollection.

[3] It is urged by the proponent that the evidence was insufficient to show a proper execution of the will of 1900, and that without such proof the execution of that will, if executed, did not work a revocation of the Beardsley will. A summary of the evidence of that transaction is: That the decedent applied to Mr. Chase and gave him directions for drawing a will; that Mr. Chase drew the will in accordance with those directions; that the will contained an attestation clause; that the entire will was read over in the presence of decedent, Chase and Fitch, and at the close of the reading the decedent said it was all right; that Chase then asked him who he would have for witnesses, and in substance and effect the decedent said that he wanted Mr. Chase and the "other fellow," meaning thereby Mr. Fitch; that the paper was then signed, first by decedent, then by Mr. Chase, finally by Fitch, all in the presence of each other. It is true there was no literal declaration that he "declared the paper so signed to be his last will and testament," but,

under the decisions, I think what transpired is equivalent to such a declaration and publication of the will.

The case of Gilbert v. Knox, 52 N. Y. 125, is cited, and an examination of the headnote in that case shows that it is misleading. The headnote seems to state that a testator, in order to legally publish his will, must state in words or substance that he "declares the instrument so subscribed to be his last will and testament." In this case it appeared that one of the subscribing witnesses said that he said in the presence of the witnesses and testator, "I stated that it was necessary he (the testator) should request us to sign his will as witnesses, * * * and he wishes us to sign it as witnesses." This witness said that the testator said nothing; "that he asked him no questions. * * * I have no doubt he heard what I said. Mr. Knox took the paper in every case." The Court of Appeals, reversing both lower courts, said that upon this evidence there was a valid publication of the will, and that words of request or acknowledgment may proceed from a third person when the circumstances show that they were adopted by the testator.

In Matter of Beckett, 103 N. Y. 167, 8 N. E. 506, one of the subscribing witnesses testified that this occurred, and that testatrix said: "'There is the paper I spoke to you about signing.' I was going to sit down, and she said, 'Wait a moment,' that she had to write first. She said, 'Are you willing to sign?' I said, 'Yes.' She said: 'Well, it may make you come to court, but you need not be afraid; there will be no trouble upon you for it.'" The other witness said, upon her arrival she was asked by the decedent to sign this paper, "that she wanted to make alterations in her previous one on account of Miss McBlair's sickness. * * * When I came there she wanted me to sign a paper again, that she wanted to make alterations of a previous one on account of Miss McBlair's sickness. * * * She just simply asked if I would sign that paper on account of Alice's sickness, that she wanted to alter it. She said she was sorry to trouble me again to sign the paper." It appeared that the paper was lying upon the table at the time, and the witness did subscribe it, and she testified further that the decedent did not declare to her or in her presence that this was her last will and testament, or that it was a codicil to her last will and testament, but it appeared that the second witness had previously witnessed wills for the decedent, and that the first witness had talked with the decedent at a previous time about her making a will. This testimony was held to be a proof of a sufficient compliance with the statute as to publication and execution; the court saying:

"It has often been held that a substantial compliance with the statute is sufficient. It requires no literal adherence to its own words and phrases, but permits the necessary information to be given in any manner adequate to the desired result. Where the testator cannot speak at all or only with difficulty, he may indicate his knowledge by signs or by words to some listeners unintelligible. He must communicate it, however; but, if he does that in a manner capable of conveying to the minds of the witnesses his own present consciousness that the paper being executed is a will, that must necessarily be sufficient. At the time of the execution of the will in controversy, the testatrix did not once call it a will, but spoke of it as a paper. To a stranger the expression would fail to indicate what kind of a paper she understood it to be, and if no more than that was communicated to the witnesses it was not sufficient. But to them the indefinite and general expression was made definite and descriptive of a will by her own words connecting the expression with a previous conversation and referring the memory of the witnesses to it. Miss Deen had been a subscribing witness to an earlier will of the testatrix which the latter had declared to be such in express terms."

In Lane v. Lane, 95 N. Y. 494, the court says this as to publication: "Although publication is as essential to the validity of a will as its execution or other prescribed formality, it has never been supposed that a particular, or even any, form of words was necessary to effect it, and in Remsen v. Brinckerhoff (in the late Court of Errors, 26 Wend. 325 [37 Am. Dec. 251]), one of the first cases arising after the enactment of the statute, it was said that by the provision in question 'the Legislature only, meant there should be some communication to the witnesses indicating that the testator intended to give

effect to the paper as his will, and that any communication of this idea or to this effect will meet the object of the statute, that it is enough if in some way or mode the testator indicates that the instrument the witnesses·are ·requested to subscribe as such is intended or understood by him to be his will.' In the same case the word 'declare' is said to signify 'to make known, to assert to others, to show forth,' and this in any manner, either 'by words or by acts, in writing or by signs.' In fine, 'that to declare to a witness that the instrument described was the testator's will must mean to make it at the time distinctly known to him by some assertion, or by clear assent in words or signs.' "

In Matter of Hunt, 110 N. Y. 278, 18 N. E. 106, the subscribing witnesses had no recollection as to the transaction, but it appeared that they signed an attestation clause which was as follows: "We, the undersigned witnesses, have signed the within in the presence of each other and of the testator, who acknowledges it to be his last will and testament." And this was held a sufficient publication; the court, by Gray, J., saying: "We think that it is a sufficient compliance with the statutory requirements if, in some way or mode, the testator indicates that the instrument the witnesses are requested to subscribe as such, is intended and understood by him to be his executed will. In probate cases the courts look to the substance of the transaction and see that there was no opportunity for imposition or fraud."

In Darling v. Arthur, 22 Hun, 84, the evidence showed that the testator said to the witness: "Jeremiah, I want you and Belle to witness my will." He then asked for a pen and ink, put his hand in his pocket, took out the will, and signed it. It was then signed by the witnesses under the usual attestation clause. The court said: "This declaration is called the publication of the will, and is one of the safeguards which the law has thrown around testators with the view of preventing the execution of wills under the supposition that they are other instruments. Any communication to the witnesses, either by word or deed, or both, which renders it certain that the testator intends the instrument which he executes to take validity and effect as a last will and testament, will satisfy this requirement of the statute; the sole end and aim being to secure freedom and certainty."

In Matter of Buel, 44 App. Div. 4, 60 N. Y. Supp. 385, a statement of the entire case with the law pertaining thereto is found in the following quotation from the opinion: "The proof convinces us that the paper, after being written out, was read over to Mrs. Buel, who then· said, in the presence of both the witnesses, that 'it was all right.' Assuming that she comprehended the language of the instrument and possessed testamentary capacity, we think this was sufficient evidence of publication. There was a full attestation clause, which, under the authority of the Matter of Bernsee, 141 N. Y. 389 [36 N. E. 314], and the cases therein cited, supplied whatever omissions there were in the oral testimony as to the request to the witnesses to append their signatures."

In the case in controversy it does appear that there was an attestation clause to the will, but the entire contents and language of that clause do not appear. I take it that there can be no inference either way as to whether it contained the usual provisions of such a clause. Had it done so, the execution and publication of the will would have been established, even though the subscribing witnesses should have denied the formalities of the execution and publication.

It is squarely held, in Matter of Will of Cottrell, 95 N. Y. 329, that: "A regular attestation clause, shown to have been signed by the witnesses and corroborated either by the circumstances surrounding the execution of the instrument, the testimony of other witnesses to the fact of due execution, or other competent evidence, is sufficient to establish the execution of a will signed by the testator, even against the positive testimony to the contrary of the subscribing witnesses."

To the same effect is Matter of Bernsee, supra. See, also, Matter of Nelson, 141 N. Y. 152, 36 N. E. 3.

[4] It is also urged by the proponent that there was no direct proof that the will contained a revocation clause. Under the authority of Colligan v. McKernan, 2 Dem. Sur. 421, it is urged that the reading of the revocation

clause by Mr. Chase at the time of the execution of the will is only hearsay testimony given by Fitch, that Fitch, himself, did not read it, did not examine the will, and for aught he knew Mr. Chase did not correctly read such clause as contained in the will itself. If this were all the testimony on that subject, there would be something in this contention, and, on that proof alone, ·the defect might be fatal to the establishment of the will of 1900; but it appears, in addition to the testimony of Fitch upon that proposition, that Kate Stebbins and Susie Austin both swear that they actually read a revocation clause in the will which the decedent showed to them and which the evidence clearly indicates was the will drawn by Mr. Chase and read over by him in the presence of Fitch. The evidence of Mr. Fitch, while hearsay in character, is corroborated by two witnesses who claim they saw and read in the will the clause revoking all former wills.

[5] It is scarcely necessary to add that probate of a will will be denied where it is proved that subsequently another will was duly executed and published which, in terms, revoked the former one, although the subsequent will has never been offered for probate and has been lost or destroyed. See Matter of Barnes, 70 App. Div. 523, 75 N. Y. Supp. 373; Matter of Brewster, 72 App. Div. 587, 76 N. Y. Supp. 283; Wallis v. Wallis, 114 Mass. 512.

It is also academic that the destruction of the subsequent will does not by that operation revive the former will. See Matter of Stickney, 31 App. Div. 382, 52 N. Y. Supp. 929, affirmed 161 N. Y. 42, 55 N. E. 396, 76 Am. St. Rep. 246, and cases above cited.

These decisions are simply declarative of the various statutes relating to the execution, publication, and revocation of wills.

If I am right in the views hereinbefore expressed, a decree should be made denying probate to the will propounded herein. A decision may be made in conformity hereto, and the question of the allowances to the proponent may be settled June 14, 1913, and decision and decree presented for signing.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Lyon & Painter, of Binghamton (H. Fred Lyon, of Binghamton, of counsel), for appellant.

Charles Clinton, of Greene, for respondents.

PER CURIAM. Decree affirmed, with costs against the proponent, upon the opinion of Stratton, Surrogate.

LYON, J., not voting.

---

### BURNS v. FIAT AUTOMOBILE CO.

(Supreme Court, Appellate Term, First Department.    January 3, 1914.)

MASTER AND SERVANT (§ 129*) — INJURY — CAUSE OF ACTION — PROXIMATE CAUSE.

Plaintiff, an employé, who showed that a chain which he fastened across the entrance of an elevator shaft was removed, and that on his return, without knowledge of its removal, he walked into the shaft and was injured, in the absence of evidence that the furnishing of a chain, instead of some other form of guard, was the proximate cause of the injury, or that the furnishing of any other form of guard would have prevented it, failed to make out a cause of action.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 257–263; Dec. Dig. § 129.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes